No. 48.—JOHN KNIGHT, as *pro. ami* of Margaret (a free woman of color) and others, plaintiffs in error, *vs.* ROBERT V. HARDEMAN and others, executors, defendants in error.

[1.] The Colonial Act of 1770, providing a mode for slaves to sue for their freedom, is of force in this State; and the several Superior Courts of this State may now perform the functions which devolved upon the *General Court* under that Statute.

[2.] The Acts of 1770, 1835 and 1837, afford a full, adequate and complete remedy, to enable persons of color to assert their freedom. And to give jurisdiction to a Court of Equity for this purpose, a special case must be presented; and the jurisdiction is exceedingly questionable under any circumstances, no such right having been conferred by Statute.

[3.] That a Judge is privately interested in the suit, constitutes a sufficient excuse why he should refuse to act officially in the premises.

[4.] Under the Act of 1770, any Judge in the State may appoint a guardian *ad litem*, as contemplated by that Statute; and the authority to make the appointment, is not restricted to the Judge of the District where the suit is to be brought.

[5.] Because, by the laws of Maryland, a testator may free his slaves when they attain to a certain age, is it incumbent upon the Courts of Georgia, or have they the right, in the face of our own Legislation against domestic manumission, to execute a will containing an emancipation clause, to the foregoing effect? *Quere.*

In Equity, in Bibb Superior Court. Decision by Judge POWERS, May Term, 1854.

In 1822, Henry Duvall, a citizen of Maryland, made his last will and testament, one item of which was as follows: "It is my will that my black woman Rebecca shall be free on the 1st

day of January, 1828; and all her issue to be free as they arrive at the age of 30 years; and all or any of my young blacks that are not manumitted, shall be free as they arrive at the age of thirty years." Margaret, (one of the complainants and the mother of the others,) was the daughter of Rebecca, and " a young black" at the time of testator's death. She arrived at 30 years of age in 1835. By some means, before reaching that age, she was sent from Maryland into Georgia, and sold from one to another until bought by one Michael J. Healey. He died, leaving Robert V. Hardeman and the other defendants in error, the executors of his will. These executors were about to sell said Margaret and her children. This bill was filed by Knight as their next friend, alleging the foregoing facts; and farther, that he had applied to said Hardeman, the Judge of the Circuit where Margaret was domiciled, to be appointed guardian for these negroes, and he had refused so to appoint him; that he had appealed to the Supreme Court from this decision, but the negroes would be sold before a decision could be had; that a suit at Law would not protect them— 1st. Because all the witnesses are resident in Maryland, and their testimony could not be procured before the sale. 2d. Because they would be sold and removed from the State before a hearing could be had. The prayer was for an injunction and a decree, declaring complainants free.

A general demurrer was sustained and the bill dismissed. This decision is assigned as error.

Stubbs & Hill, for plaintiff.

McDonald, for defendant.

*By the Court.*—Lumpkin, J. delivering the opinion.

This was a bill filed by complainants, to enjoin their sale as slaves, and to establish their freedom. They are negroes. The bill was demurred to generally; the demurrer was sustained and the bill dismissed. The judgment of the Court on the demurrer is alleged as error—1. The bill alleges that Mar-

garet Phillips was, on the 5th day of June, 1822, the property of Henry Duvall and daughter of Rebecca Phillips, who was the property of said Duvall.   2.  Duvall, on that day and year, made and published his will, by which he declared that his negro woman Rebecca should be free on the 1st January, 1828, and her issue to be free as they arrived at the age of 30.   3. That Margaret is the daughter of Rebecca, and attained the age of 30 in 1835.   4.  That Duvall was, at the time of his death, domiciliated in Maryland; and that his will was in strict accordance with the laws of that State; and that the executor ought to have carried it out.   5.  By act, contrivance or fraud, she was sent off to Georgia; and after having been repeatedly sold as a slave, in the year 1840, or thereabouts, she was purchased by Michael M. Healey, who departed this life in 1850, after having made a will appointing Hardeman and Moreland, then and now of Jones County, and McCarthy, now of Bibb County, his executors.   6.  Executors qualified and became possessed of Margaret and her children; and having obtained leave to sell them, will sell them on the first day of January next ensuing, before the court-house door in Jones County, unless restrained by the equitable interposition of the Court.   7.  That Knight had applied to the Honorable ROBERT V. HARDEMAN, Judge of the Superior Courts of Jones County, to be appointed guardian of said woman and children, which he refused to do; and to which decision he excepted, and will carry it to the Supreme Court by writ of error; and before a decision will be made on said writ of error, the negroes will be sold and removed beyond the limits of the State.   8.  If it were in his power to sue at Law for their freedom, the negroes would be sold and removed beyond the limits of the State, unless defendants are prevented from selling them.   9.  He has no remedy at Law, because his witnesses, to prove the identity of the negroes, reside in Maryland; and their attendance cannot be procured before the time appointed for the sale, because Hardeman, defendant, is the Judge applied to, and who refused to appoint Knight, next friend, &c. of the negroes, guardian; whose decision was excepted to, and

before a decision can be had, the said negroes will be sold and removed out of the State.   10. Sets forth the value of hire and the length of time the negroes were in possession of the deceased and of his executors.   11. The bill prays that their freedom may be established and an account taken of the hire, a guardian appointed, and the sale perpetually enjoined.   This is an epitome of the bill.

Is there equity in the bill ?

[1.] Waiving several of the technical objections to the sustainability of the bill, as discussed by Governor McDonald, has not the party, in this case, an ample remedy at Law?   And does he assign any sufficient reason for not resorting to that forum?

The first Act upon this subject is the Provincial Statute of 1770, (*Cobb's Digest*, 971.)   By the 1st section of this Statute, it is enacted—"That all negroes, Indians, mulattoes or mestizoes, who now are or shall hereafter be in this Province, (free Indians in amity with this Government, and negroes, mulattoes or mestizoes, who now are or hereafter shall become free excepted,) and all their issue and offspring born or to be born, shall be, and they are hereby declared to be, and remain forever hereafter, absolute slaves, and shall follow the condition of the mother, and shall be taken and deemed, in law, to be chattels, personal, in the hands of their respective owners or possessors, and their executors, administrators and assigns, to all intents and purposes whatsoever : *Provided always*, that if any person or persons whatsoever, on behalf of any negro, Indian, mulatto or mestizoe, do apply to the Chief Justice or Justices of his Majesty's General Court, by petition, either during the sitting of said Court, or before the Chief Justice or any of the Justices of the same Court, at any time in the vacation, the said Chief Justice or any of the said Justices shall be, and he and they is and are hereby empowered to admit any such person, so applying, to be guardian for any negro, Indian, mulatto or mestizoe, claiming his or her freedom; and such guardian shall be enabled, entitled and capable, in Law, to bring an action of trespass in the nature of ravishment

of ward, against any person or persons who shall claim property in or shall be in possession of any such negro, Indian, mulatto or mestizoe; and the defendant or defendants shall and may plead the general issue on such action brought, and the special matter may and shall be given in evidence. And upon general or special verdict found, judgment shall be given according to the very right of the cause, without having any regard to any defect in the proceedings, either in form or substance; and if judgment shall be given for the plaintiff, a special entry shall be made declaring that the ward of the plaintiff is free; and the Jury shall assess the damages which the plaintiff's ward hath sustained; and the Court shall give judgment and award execution against the defendant for such damages, with full costs of suit: but in case judgment shall be given for the defendant, the said Court is hereby fully empowered to inflict such corporeal punishment, not extending to life or limb, on the ward of the plaintiff, as they in their discretion shall think fit: *Provided, always,* that in any action or suit to be brought in pursuance of the direction of this Act, the burden of the proof shall lie on the plaintiff; and it shall always be presumed that every negro, Indian, mulatto or mestizoe, (except as before excepted) is a slave, unless the contrary can be made appear.

Section II. "In any action or suit to be brought by any such guardian as aforesaid, appointed pursuant to the direction of this Act, the defendant shall enter into a recognizance with one or more sufficient sureties to the plaintiff, in such sum as the said General Court shall direct, with the condition that he shall produce the ward of the plaintiff at all times, when required by the Court, unless such defendant shall prove, upon oath, to the satisfaction of the said Court, his inability to produce such ward; and that while such action or suit shall be pending and undetermined, the ward of the plaintiff shall not be abused or misused."

Is this Act of force in this State?

It was adopted, according to the express terms of the Act of

1784; it is contained in every Digest that has been made of the Laws; it was the only law regulating suits for freedom up to 1835; it is known to some of us that proceedings were instituted under it; there is nothing in the subsequent Acts of 1835 and 1837 which, directly or by necessary implication, repeals the Act of 1770; it is the only Act which provides for Indians, mulattoes and mestizoes; the Statutes of 1835 and 1837 being applicable to negroes only. Our conclusion therefore is, that this Act is of force.

The next inquiry is, what tribunal shall perform the functions which devolved upon the General Court, as it was called, under the Provincial Act of 1770? Undoubtedly our Superior Courts. All of our legislation recognizes the fact that the powers exercised by the old Court passed, *sub silentio*, into the several Superior Courts when the State Government was organized; and the Judicial powers were distributed amongst the different Courts. The law regulating the partitioning of land is a notable instance of this transition. The Provincial Statute upon this subject was enacted as early as 1767. It recites, that it was inconvenient, in this Province, to pursue the method of dividing lands and tenements by writ of partition, as practised in Great Britain; and that it was necessary to provide a more easy and less expensive manner of obtaining partitions. It, therefore, empowers the "*General Court of Pleas*" to grant writs of partition, &c. And thus, from 1767, three years before the Slavery Act of 1770 was passed, down to 1827, the jurisdiction of the "General Court of Pleas" was exercised by our Circuit Courts, without any express authority to that effect. And what is a little remarkable, the Act of 1827, to cut down the number of partitioners from eleven to five free-holders, recites, in the preamble, that "whereas, by the Act of 1767, it was made the duty of the '*Superior Courts*' in this State, &c. when in truth the *Superior Courts*, as such, had no existence, except in its prototype and predecessor, the *General Court of Pleas*." (See *Cobb's Digest*, 581, 2, 3.)

Much is, after all, assumed and understood in the legislation of a people, as in every thing else, otherwise our own system

will be found, upon close scrutiny, to be lamentably defective.

[2.] Let us, next, examine cursorily the Acts of 1835 and 1837. By the former it is declared, "That it shall and may be lawful for any Justice of the Inferior Court of any county of this State, upon the complaint of any free person of color, that he, she or they are fraudulently or illegally held in slavery, to make due inquiry into all the circumstances of the case; and if, upon such examination, the Justice shall be satisfied that there is probable ground to believe that such complainant or complainants are improperly and illegally held in a state of slavery, it shall be his duty to order such person or persons into the custody of the Sheriff of the county until the pretended owner or owners shall enter into bonds, with good security, for double the value of such person or persons of color not to remove or attempt to remove such free persons of color from the county where this examination. is held, before the cause is finally adjudicated; whereupon, it shall be the duty of the Sheriff to deliver such persons of color to such pretended owner: but if the persons claiming to be the owners or proprietors of such person or persons shall fail or refuse to give bond and security as aforesaid, the Sheriff shall retain him, her or them in his possession."

Sec. II. "It shall be the duty of the Justice of the Inferior Court, before whom the examination is had, to reduce the statement to writing, and to return the same to the Clerk of the Inferior Court of the county, who shall docket the case, stating the names of the parties, &c. which shall stand for trial the first Court after the same is docketed, unless either party, for want of evidence, or other sufficient cause, should move to continue the cause, which may be done for one term and no longer."

Sec. III. "The Inferior Court shall cause the parties to make up an issue involving the complainant's right to freedom, which shall be submitted to a Jury as in other cases: but either party being dissatisfied with the verdict, shall be permitted to appeal to the Superior Court, without giving bond and security, as in other cases."

Sec. IV. " Should the complainant, upon the final trial of the case, succeed in obtaining a verdict in his favor, the Court shall order such person of color to be set at liberty and a guardian to be appointed, as is now regulated by law." (*Cobb's Digest,* 1007.)

This Act, it will be seen, contemplates a proceeding to be instituted at the instance of the colored person. By the Act of 1837, provision is made, that "upon the complaint of any free white person, upon oath, showing that he has good reason to believe and does believe that any person or persons of color are free and are fraudulently held in slavery," it is made the duty of any Justice of the Inferior Court of any county of this State, to issue his warrant, directed to the Sheriff or any lawful constable, to arrest the holder as well as the slave, and to cause both to be brought before him, that due inquiry may be had into all the circumstances of the case; and if, upon such examination, the said Justice shall be satisfied that there is probable ground to believe that such persons of color are improperly held in a state of slavery, to require the person so detaining them to enter into bond, with sufficient security, payable to the party making the affidavit as the *prochein ami* of the slave, conditioned for the delivery of the slave, in obedience to the mandate of the Court, to abide its final order, and that said colored person shall not be removed beyond the limits of the State in the meantime; and on failure to do so, the person of color is to be delivered to the complainant to the like effect, &c. (*Cobb's Digest,* 1011.)

[3.] Without dwelling longer upon the provisions of these several Acts, do they not, singly or combined, afford the most full and complete remedy, to enable persons of color to assert their freedom ? What then are the special facts set forth in this bill, to give jurisdiction to Chancery? They are, First, That Judge Hardeman, who is one of the executors of Healey's will, refused to appoint the plaintiff in error guardian; and Secondly, That owing to the non-residence of the witnesses, by whom the identity of these people could alone be proved, &c.

complainant could not procure their testimony in time to prevent the sale in January next ensuing the application.

[4.] As to the complaint against Judge Hardeman, why did Knight apply to him? why call upon him to prejudice the estate of his testator, which, by previous and consequently paramount obligation, he was bound to protect, by sanctioning this proceeding? So far from the refusal of Judge Hardeman to act officially in the premises, on account of his interest, furnishing any ground of complaint or pretext for a change of jurisdiction, it constituted a good and sufficient excuse why he should not act, and the complainant can take no advantage of his doing so. Why go to Judge Hardeman? One of the executors, McCarthy, resided in Bibb County—why was not the application for guardianship made to the Judge of the Macon, instead of the Ocmulgee Circuit? It was he who sanctioned this bill of injunction on account of the interest of Judge Hardeman. Why call upon Judge Powers to perform this service and not the other? Indeed, according to our construction of the Act of 1770, (which is admirably adapted to proceedings of this sort, and which, ordinarily, will be found to be a better working Statute than either of its successors) the mere preliminary proceeding of appointing a guardian, might have been discharged by *any* Judge of the Superior Courts of the State.

And as to the other ground of equity, to wit: the inability of the complainant to procure the attendance of the Maryland witnesses to establish the identity of Margaret Phillips and her descendants, in time to prevent the sale, there is no averment in the bill that the attendance of these witnesses was expected at any future time. The Courts have no power to coerce their attendance, living in another jurisdiction. But waiving this objection, we say that under each of the Acts already cited, abundant provision is made for protecting persons of color from being eloined or removed beyond the jurisdiction of the State before a trial can be had. And a resort to this, would have prevented all the mischief apprehended from the approaching sale.

Decisions have been read from Virginia, Tennessee and sev-

eral other of the slave or *quasi* slave States, to the effect, that in suits for freedom, the jurisdiction of Chancery is not ousted by the enactment of Statutes for this purpose. I shall be pardoned, I trust, the apparent presumption in suggesting that questions involving slavery, have not, heretofore, been discussed, even in the slave States, with that thoroughness which either principle or their intrinsic importance demanded. The Courts as well as the country, are just waking up to a proper appreciation of their momentous duties and responsibilities in this respect. For ourselves, we are strongly inclined to hold the very converse of the doctrine referred to from our sister States to be true, namely: that the Courts, themselves, can only move in this matter, in the course indicated by the express legislation of the State; and that where the law stops their jurisdiction stops. We speak, of course, in relation to domestic and not to extra-territorial emancipation. The bill before us does not involve the latter question. This whole question is one of State policy, and should not be put upon these principles of *meum et tuum*, which regulate individual rights. At any rate, before yielding to the claim of jurisdiction here set up, a very strong case must be shown for the interposition of a Court of Chancery.

As to the position that a *bona fide* purchaser should be protected, inasmuch as these people failed to give notice of their claim to freedom at the time they were sold, we attach no importance to that. It would be preposterous and unjust to visit such consequences upon persons in their condition.

[5.] I must be pardoned for suggesting, that to my mind, there lies, at the foundation of this case, a much stronger objection to this whole proceeding, than any which have been discussed by the learned Counsel. And that is, the want of equity in the bill, not because the complainants have ample redress *at Law*, if any where; but because neither Courts of Law nor of Equity have any right to grant the relief which they seek.

We have, in this State, the most stringent Statutes which the ingenuity of our wisest statesmen could devise, to prevent

domestic manumission.   For fifty years, the policy of our legislation has manifested no variableness nor shadow of turning in this respect.   Can the laws of a sister State, then, allowing the freedom of these slaves, be executed by the Courts of Georgia?   Dare we say, in the face of the Acts of 1801 and 1818, that these foreign laws are not prejudicial to our own rights and interests?   Are we not under paramount obligation to enforce our own policy?

To my mind, this is a plain case.

No one pretends that negroes can be carried to New York or any other free State, and held there in perpetual bondage by their owner, in defiance of the laws and policy of that State. With what more propriety can slaves be brought here and emancipated?   Such a doctrine is wholly inadmissible.   It might be used to subvert the domestic institutions of every slave State in the Union.   Our Courts of Justice are powerless to exercise an authority so repugnant to the declared will of their own Government.

But I forbear to discuss this point, inasmuch as the decision below may be sustained upon the other ground.